UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| Alvin R. McDonald, | § | CIVIL ACTION NO. <u>09-CV-573-GKF-TLW</u> |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| Akal Security and Eric Holder, | § | |
| Attorney General of the United States, | § | |
| Defendants. | § | A JURY IS DEMANDED |

**Plaintiff's Motion to Compel Discovery from Federal Defendant**

# TABLE OF CONTENTS

I.  The Nature of the Case and Failure to Comply with Discovery. . . . . . . . . . . . . . . . . . . . . . . . 2

II.  The First Deficiency: Unresponsive Answers to Plainly Worded Interrogatories.. . . . . . . . . . 4

       1.  Interrogatory No. 3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
       2.  Interrogatory No. 4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
       3.  Interrogatories 5, 6, 8, and 10.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.  The Second Deficiency: Failure to Produce Highly Unfavorable but Relevant Documents. . 7

       1.  Request No. 7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
       2.  Request 13. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
       3.  Requests 30, 31, 32, 33, 34, and 35. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

IV.  The Third Deficiency: Government Failure to Comply with Rule 30(b)(6). . . . . . . . . . . . 18

       1.  Failure to Designate Witness on Topic 16. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
       2.  Failure to Produce Witnesses on Topics 5, 6, 17, 18, 19, and 21. . . . . . . . . . . . . . . 20
       3.  Improper Objections. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

# TABLE OF AUTHORITIES

## CASES

*Gomez v. Martin Marietta Corp.,* 50 F.3d 1511 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . 1

*Gunnels v. Ashcroft,*  2004 U.S. Dist. LEXIS 31104 (S.D. Tex. 2004). . . . . . . . . 12, 13, 16-18, 20

*Ruiz v. Mukasey*, 594 F.Supp.2d 738 (S.D. Tex. 2008). . . . . . . . . . . . . . . . . . . . . . . . . 3, 9, 13-15

## STATUTES

29 U.S.C. § 791 *et seq*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. §12112(b)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. §12112(b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## RULES

Fed. R. Civ. P., Rule 37(a)(3)(B)(ii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

## OTHER AUTHORITY

29 C.F.R. § 1630.15(c).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 15

29 C.F.R. § 1630.2(n). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

29 C.F.R. § 1630.2(r). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Pattern Jury Instructions Civil, Fifth Circuit (West 2009) 11.7.4. . . . . . . . . . . . . . . . . . . . . 15, 17

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| Alvin R. McDonald, | § | CIVIL ACTION NO. <u>09-CV-573-GKF-TLW</u> |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| Akal Security and Eric Holder, | § | |
| Attorney General of the United States, | § | |
| Defendants. | § | A JURY IS DEMANDED |

**Plaintiff's Motion to Compel Discovery from Federal Defendant**

The plaintiff, Alvin McDonald, files this motion to compel to seek this Court's assistance in obtaining proper responses to written discovery served on the government on February 10, 2010 and a 30(b)(6) deposition notice served on March 10, 2010.  The government sought multiple extensions, then moved to stay all its discovery (unsuccessfully), and then, four months after the requests, filed unresponsive answers to direct interrogatory questions, failed to provide relevant documents, and refused to comply with its obligations under Rule 30(b)(6).

It is a well-settled proposition of law – and firmly embedded in Federal Rule 26 – that a party is not permitted to state an affirmative claim or an affirmative defense in litigation and then stonewall on providing information that shows precisely the opposite.  As the Tenth Circuit has also recognized, the scope of discovery in an employment discrimination case should not be narrowly circumscribed.  *Gomez v. Martin Marietta Corp.,* 50 F.3d 1511, 1520 (10th Cir. 2000).

This motion to compel is necessary because the defendant is trying to prevent any effort to discover the information that would rebut its affirmative defenses.  The government has asserted two affirmative defenses that would excuse otherwise unlawful disability discrimination, those of "direct threat" and "business necessity,"  but has steadfastly refused to supply critical evidence bearing on those affirmative defense.  It tries to prevent any effort to show, for example,  that the policy is not uniformly applied.  It also tries to prevent Mr. McDonald from acquiring evidence of pretext.  It

claims that the policy is uniformly applied and a necessity but stonewalls on providing any evidence that would undermine that position.  Hence, this motion.

### I.  The Nature of the Case and Failure to Comply with Discovery

For almost seven years, the plaintiff, Alvin McDonald, protected the federal judiciary and the public at the federal courthouse in Tulsa.  He was a Court Security Officer (CSO).  Although he was extremely competent, receiving exemplary evaluations  and the respect of the judiciary, the government ordered him removed from his job on July 11, 2008.  The government had the power to do that under a contract it has with Akal, the co defendant which is a contractor that provides officers who are approved by the federal defendant to serve as CSOs.

In a nutshell, the government deemed Mr. McDonald unfit because he has a severe hearing impairment in his left ear (even though he has excellent functional hearing at great expense through state of the art hearing aids).  It therefore ordered Akal to remove him from the job and he was summarily discharged with no right of appeal.

When Mr. McDonald brought this suit, the government asserted two affirmative defenses that would excuse otherwise unlawful conduct.  This is important because the Rehabilitation Act defines unlawful discrimination as utilizing any standards which "screen out" or "tend to screen out" those with disabilities.  42 U.S.C. §12112(b)(6); 29 U.S.C. § 791 *et seq*.  Unlawful discrimination is also defined as "participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter."  42 U.S.C. §12112(b)(2).  The government has committed both of these infractions, so it must rely on affirmative defenses to excuse them.

The government's two affirmative defenses are "direct threat" and "business necessity." Hence, the plaintiff's burden of proof consists of two elements: first, that he is a qualified person with a disability, and second, that the defendants removed him because of his disability (or that it violated the per se discrimination provisions described above). The government's burden of proof on its affirmative defenses is formidable. For example, the direct threat affirmative defense has specific elements. To prove Plaintiff posed a direct threat, Defendant must prove it performed a specific personal individualized  assessment of Plaintiff's ability to safely perform the essential functions of the job, based on reasonable medical judgment that relied on the most current medical knowledge and/or on the best available objective evidence See 29 C.F.R. § 1630.2(r).

Likewise, the business necessity defense requires rigorous proof of key elements. A defendant asserting this defense to excuse otherwise unlawful disability discrimination must show that the qualification standard screening out those with disabilities must prove that the standard is

1. Uniformly applied;
2. Job-related for the position in question;
3. Consistent with business necessity; and
4. Cannot be met by a person with plaintiff's disability even with a reasonable accommodation.

*See* 29 C.F.R. § 1630.15(c) (1999) (describing the four elements a defendant must prove to sustain burden).

Ironically, at about the same time that the government was removing Mr. McDonald from a job he did so well, the first federal jury in the country was being asked by the government to embrace its business necessity defense, in another CSO case. The jury rejected the defense, and the district court held that the verdict was supported by substantial evidence. *See Ruiz v. Mukasey*, 594 F.Supp.2d 738, 38 NDLR P 168 (S.D. Tex. 2008).

In this case, which was filed in this Court on September 4, 2009, Mr. McDonald brought claims for disability discrimination as described above, and the government asserted the affirmative defenses described above.  After the government answered on November 13, 2009, the plaintiff began drafting discovery requests to the government.  Accordingly, on February 10, 2010, he served interrogatories, and requests for production.  This set of discovery requests is attached as Exhibit 1. On March 10, 2010, Mr. McDonald served a notice of deposition pursuant to Rule 30(b)(6).  A copy of this notice is attached as Exhibit 2.

On June 10, 2010, the government served its answers to interrogatories, its responses to the requests for production and its "Response to Plaintiff's Rule 30(b)((6) Notice of Deposition of Government."  These three responses are attached as Exhibits 3, 4 and 5, respectively.

After a thorough review of these three responses, Mr. McDonald's counsel sent the government a conferral letter, detailing what Mr. McDonald believed were woefully deficient responses under the Rules.  This letter is attached as Exhibit 6.

The government, in a lengthy response, recited that it simply disagrees with Mr. McDonald on most issues.  Counsel then conferred by telephone, and reached some common ground.  However, the parties need the Court's assistance  in getting the discovery train down the track.[1]

**II.  The First Deficiency: Unresponsive Answers to Plainly Worded Interrogatories**

There is a very disturbing pattern to the government's answers to the interrogatories.  It is this.  Instead of answering the questions posed, it instead pasted its arguments as to why it should prevail in the case.

---

[1] Pursuant to the Local Rules, counsel conferred by telephone, letters and email, due to the distance between counsel for Mr. McDonald and the government.

1. **Interrogatory No. 3**

Interrogatory No. 3: Identify any and all job duties that you allege Mr. McDonald was unable to perform or was substantially impaired in performing at the time he was terminated from his job in 2008 and describe the basis for your conclusions.

The five page response contains no answer to that very simple question. Instead, it is a verbose argument about what it says the functions of the job *are,* not an answer to a plainly worded question about which precise essential functions that it claims Mr. McDonald could not perform. The interrogatory simply directs the government to identify any of the essential function of the job that Mr. McDonald was "unable to perform or was substantially impaired in performing" on the date he was discharged. The government has already admitted in other cases that there are only six "essential functions" of the job that relate to hearing:

Hearing

24. Comprehend speech during face-to-face conversations*
25. Comprehend speech during telephone conversations
26. Comprehend speech during radio transmissions*
27. Comprehend speech when you can't see another CSO*
28. Hear sounds that require investigation*
29. Determine location of sound*

Because there are only six functions deemed as "essential," which is a term of art in the Americans With Disabilities Act and Rehabilitation Act, and because the statute treats "essential" functions differently than the "marginal functions" of the job, the interrogatory was carefully limited to inquiring about "essential" functions. This is because for a person with a disability need not be able to perform the "marginal" functions in order to be "qualified." *See* 29 C.F.R. § 1630.2(n); 29 C.F.R. § 1630 App. § 1630.2(n).

5

As the Court can readily see, the answer does not identify any *essential* functions that Mr. McDonald was "unable" to perform or was "substantially impaired" in performing.  After spending several paragraphs with non responsive prose, the government then lists some *marginal* functions that the government says Mr. McDonald "likely" would have "difficulty" in performing, not that he was *unable* to perform them on the job.  There are multiple problems with this sort of parsing.  First, the tasks listed in its response are not essential functions at all.  Second, the question did not deal with whether in the *future*, Mr. McDonald "likely" would have "difficulty" performing these marginal tasks.  This interrogatory should have been answered in a straight forward manner, and it was not.

2. **Interrogatory No. 4.**

Interrogatory 4.  Identify any and all employment problems relating to performance of the essential functions of Court Security Officers that have actually occurred as a result of a medical condition of a Court Security Officer including, but not limited to, hearing, sight, hypertension, diabetes or heart disease since 2001.

Interrogatory No. 4 asks about *on the job* employment problems due to physical impairments, and the government simply refused, in its verbose answer to either admit or deny that Mr. McDonald or his fellow CSOs ever had any such problems.  Either the government will have to admit that the plaintiff's work performance was compromised on the job or it was not.  His *on the job ability* to perform all the essential functions of the job for many years is directly relevant to whether he was "qualified" to perform the job.

3. **Interrogatories 5, 6, 8, and 10.**

Interrogatory No. 5:  During the time that Mr. McDonald was employed as a Court Security Officer, please specify, how, if at all, his hearing loss substantially interfered with the following job functions:

    a.  Ability to comprehend speech during face-to-face communications;
    b.  Ability to comprehend speech during telephone conversations;
    c.  Ability to comprehend speech during radio transmissions;

d.  Ability to distinguish higher frequency tones such as fire alarms and smoke detectors;

e.  Ability to comprehend speech and distinguish sounds in loud and/or reverberant environments;

f.  Ability to comprehend speech when he did not have eye contact with the speaker.

Interrogatory No. 6:  State whether anyone at the USMS had been contacted about any concern or deficiency in Mr. McDonald's job performance before he was disqualified as a Court Security Officer and, if they had, identify the deficiency or concern raised, when it was raised and by whom.

Interrogatory No. 8:   Please state all facts that tend to show that hearing aids have ever failed on the job with respect to federal marshals or court security officers, or any factual or historical basis for any belief on the part of the USMS that business necessity requires that hearing aids be banned in order to pass the hearing tests for CSOs.

Interrogatory No.10:  Do you have any ban on the use of other mechanical devices, such as insulin pumps and pacemakers?  If so, please explain what it is.

As the Court can see from the conferral letter attached hereto as Exh. 6 and the government's

answers to the interrogatories, this pattern was repeated, resulting in woefully deficient answers to

Nos. 3, 4, 5, 6, 8, and 10.  In short, if a lay witness answered so evasively and unresponsively on the

witness stand, the Court would disregard the nonresponsive answer and simply require the witness

to answer the question posed.  Here, the government should be directed to simply answer the

questions: no more and no less.  The objections should likewise be overruled.

### III.  The Second Deficiency: Failure to Produce Highly Unfavorable but Relevant Documents

1.  **Request No. 7.**

Request No. 7.  All documents generated by the government, including the United States Marshal's office, justifying or supporting the medical screening changes made from 2000 to the present.

An obvious problem with the government's failure to produce documents is revealed by its

response to Request No.  7.  That request sought relevant documents justifying the government's

changes in the hearing standard from 2000 to the present.

As the Court may be aware, until 2000, the USMS did not ban the use of hearing aids to comply with the hearing standards for the job.  So long as the CSOs passed the tests, regardless of whether they passed the tests with or without utilizing hearing aids, they were fit for duty as long as they utilized the hearing aids on the job.  The government has produced myriads of documents which it says justified the 2000 changes, but no documents on the change that took place early this year.

In 2000, after a no bid contract was let to a Dr. Richard Miller of Federal Occupational Health, the USMS banned hearing aids from being utilized to pass the hearing tests.  Under that standard, no matter *how well* a CSO could hear, if that good hearing was as a result of state of the art hearing aids, they were banned if they could not pass the tests *without* hearing aids.  This was the case even if the CSO with hearing aids could hear much better than those who passed without hearing aids. For those who managed to pass without hearing aids, they were allowed on the job. Under Dr. Miller's standard, those with severe hearing loss could work without hearing aids, while those with normal hearing skills with the use of hearing correction with hearing aids were not allowed to work.  But still, the government claims that the standard that ensnared McDonald is supported by its affirmative defense of business necessity.

Not surprisingly, the 2000 retreat from prior practice resulted in much litigation and complaints by the federal judiciary.  CSOs with good hearing complained that the ban on the use of hearing aids actually *compromised* the safety of the judiciary instead of *enhancing* it.  For example, in the *Gunnels* case, discussed below,  the district court actually granted a CSO's motion for summary judgment on direct threat and denied the government's motion for summary judgment on its defenses.  And in the *Ruiz* case, the jury rejected the affirmative defense of business necessity and awarded damages to the CSO.  The district court found that the verdict was supported by

substantial evidence and entered judgment. *See Ruiz v. Mukasey*, 594 F.Supp.2d 738, 38 NDLR P

168 (S.D. Tex. 2008).  See Exhibit 7.  After the government filed a notice of appeal, it settled the

case for $700,000 in 2009.

Soon after the *Ruiz* case was settled,  the government came full circle and returned to the pre

2000 practice of individualized assessment.  It discarded its ban on the use of hearing aids to pass

hearing tests, and returned to the pre 2000 policy that requires CSOs to be tested with, or without

hearing aids, and then cleared so long as they can meet the standards with the use of their hearing

assistive devices.  That is, as long as a CSO had good hearing skills, it did not matter if the CSO

utilizes hearing aids to demonstrate such prowess.  And if the CSO utilized hearing aids to pass the

tests, then of course the CSO must also utilize them on the job.  That was the policy before 2000 and

that is the now the policy again in 2010. However, Mr. McDonald was terminated during the period

in which the ban was in effect.

For Mr. McDonald, the government paradoxically still insists in *this* case that the *old* hearing

aid ban is supported by the business necessity affirmative defense that it has now abandoned.  Of

course, in discovery, Mr. McDonald has the right to know how the ban was "necessary" and job

related in 2008 but is no longer necessary in 2010.  Request No. 7 asked about the rationale for both

the ban and the abandonment of it. The government objected on the basis of relevance, but did

supply evidence that it claims *supports* the ban, but it failed to provide any documents at all as to

the justification for returning to the policy (no ban on hearing aids to comply with the tests) that had

existed before 2000.  As the conferral letter made clear, this evidence is highly relevant with respect

to the government's affirmative defense of business necessity.  The best evidence that this ban was

not necessary is the fact that it abandoned the standard after a jury found it was improper.  Courts

have previously ruled that documents that tend to show the risks created or mitigated with a given

qualification standard are highly relevant. Mr. McDonald's conferral letter contained a copy of a court order holding that these documents are "clearly" relevant to the defense.   As Judge Owsley explained,

> The documents plaintiff seeks to discover bear on the risk tolerated by defendant both with respect to hearing and other medical conditions, and therefore are relevant to defendant's claim of business necessity.  Defendant has already produced Federal Occupational Health records covering the period from 2001 to 2004, which were produced in *Gunnels v. Akal Security, Inc*., et al., C-02-CV-132, indicating that defendant knew such records to be relevant.

(Ex. 9 at 10-11).

The government has produced no documents that remotely address why it was necessary to ban hearing aids to pass the tests in 2008 but not now. Now it may be that the government will abandon the business necessity defense with respect to the hearing aid ban it practiced with respect to Mr. McDonald, and rest on its direct threat defense.  But until it takes that step, it is important that Mr. McDonald prepare for trial on business necessity as well as direct threat.  Thus, these documents should be produced.  The government cannot credibly claim that the standard is uniformly applied and a necessity when it refuses to allow discovery of the evidence that would show to the contrary.

2. **Request 13**.

Request 13.   All documents from January 1, 2006, to the present, from the Disability Rights Section of the Civil Rights Division of the Department of Justice to any state or local governmental entity that involve in any way alleged discrimination against individual(s) based on their hearing ability.

Likewise, the government initially refused to fully comply with Request 13, which sought documents regarding its suing and threatening suit against state and local law enforcement agencies who had hearing aid bans like the one the government is defending here. While the federal government's demands that state and local governments stop using hearing aid bans, while it chooses to defend them when it practices such a ban, these documents bear upon the business

necessity defense. The same precise issue arises with Requests and 15 and 16.  The day before this motion was filed, the government tendered documents bearing upon its efforts to require state and local governmental entities cease using hearing aid bans, but it redacted the names of these governmental entities.  As taxpayer funded entities, their identity is public record.  Immediately before this motion was filed, the government removed some redactions, and counsel for Mr. McDonald will review those to determine whether further court intervention is required.

    3.  **Requests 30, 31, 32, 33, 34, and 35.**

    Request 30.  All emails between any FOH doctor (including Miller, Chelton, Barson, and Goldhagen), on the one hand, and any USMS employee, on the other hand, from 2000 to the present regarding medical disqualification of a CSO.

    Request 31.  All emails from 2000 to the present between USMS employees regarding medical disqualifications of CSOs based on failure to meet the hearing standard.

    Request 32.  All emails from 2000 to the present between any USMS employee and a member of the judiciary regarding medical disqualification of a CSO.

    Request 33.  All documents prepared by Dr. Lynn Cook regarding a medical disqualification of a CSO from January 2008 to the present.

    Request 34.  The FOH medical determinations for all CSOs who have been qualified or disqualified since the conclusion of *Gunnels v. Ashcroft* in 2004.

    Request 35.  The updated FOH medical determinations for CSOs (referenced in Interrogatory No. 13).

The subject matter of these requests relate to the government's affirmative defenses of "direct threat" and "business necessity," as well as how the government determines whether a CSO is "qualified" as that term is defined by the Americans With Disabilities Act and Rehabilitation Act. They relate to the government's documents regarding the government's fitness for duty determinations for other CSOs.  Although it has produced these documents in prior litigation with CSOs represented by the undersigned, it doggedly refuses to supplement those records now.  The

Case 4:09-cv-00573-CVE-tlw   Document 43 Filed in USDC ND/OK on 06/21/10   Page 15 of 26

government has objected to all the requests and will not produce any such documents except for Mr. McDonald's own fitness for duty documentation. As the Court will see, this is not the first time the government has stubbornly resisted producing these highly relevant documents. Two courts have already overruled such objections.

By way of background, with which Judge Wilson is familiar in connection with the government's motion to stay all discovery, the government was ordered to produce all fitness review documentation of CSOs in order to assess its business necessity defense. This was ordered by the Hon. Janis Jack, a district judge in the Southern District of Texas, Corpus Christi Division. After the records were produced, the Court denied the government's motion for summary judgment on the affirmative defenses. *See Gunnels v. Ashcroft*, 2004 U.S. Dist. LEXIS 31104 (S.D. Tex. 2004). See Exhibit 8.

In the *Gunnels* case, these documents were produced in three banker's boxes. The records covered CSOs that were declared fit for duty and those who were declared unfit for duty. The records encompass the years 2000 through 2003. They were produced near the end of the *Gunnels* case, and after the district court denied the government's motion for summary judgment, the government then settled the claims in that suit and a companion suit for more than $400,000.

In a later case, *Ruiz v. Mukasey*, the plaintiff requested the government to supplement the fitness review documentation because they had not been updated for 2004-2008. The government resisted supplementing those documents, presumably because the records were highly unfavorable to the government because they show that the government allows those with profound hearing loss to work and that the standard compromised safety instead of enhancing it. So the government forced the plaintiff to file a motion to compel discovery, and forced the Court to order it to

supplement those records, holding that they were "highly relevant" to the government's "business necessity" affirmative defense. That order is attached as Exhibit 9.

However, the government did not supplement those records as ordered by the Court. When Mr. Ruiz renewed his motion to compel them, the government said they had been destroyed in the ordinary course of business. While the district court (not the *Gunnels* court) *initially* refused to find bad faith, due to the government's insistence that it had destroyed them in the ordinary course, the district court reversed course at the trial. That is because the government's chief medical reviewer testified under oath that the information had not been destroyed after all and that he was still utilizing, even in the fall of 2008, these records of CSOs to assist him in drafting his fitness reviews. Recall that the records produced in *Gunnels* consisted of the actual memorandum that declared the CSO fit or unfit, and then, behind it, was the medical chart that depicted the reasoning behind the memorandum and the actual medical conditions of the CSO. Dr. Chelton, the government's chief medical reviewer, testified as follows, after he had taken the jury through the documents that showed how the government's standard had allowed numerous people to work who had severe impairments:

> Q. Are you still able, on September 23, 2008, to look at the records, precisely the same sorts of records that you and I have been looking at, that have the qualification statements and the notes?
>
> A. Yes.
>
> Q. You still today can find those?
>
> A. Yes.

Court Reporter's Record, *Ruiz v. Mukasey*, Vol. 2, p. 271. The district court was stunned at this testimony that contradicted the government's previous claim that it had destroyed these very records in the ordinary course of business:

> THE COURT: What they're saying today is not that you had the records, but caused them to be destroyed so that they couldn't get access to them, but that's just kind of the reverse of that: That you or somebody under your control does have the records, but you didn't admit it.  You said, "We don't have them."

Court Reporter's Record, *Ruiz v. Mukasey*, Vol. 3, p. 176.

The district court later included a spoliation instruction in the charge.  In other words, the district court, while initially denying a spoliation instruction, then reversed course after Dr. Chelton testified.  Mr. Ruiz's counsel pointed out that while he respectfully felt that there *had been* bad faith in failing to *produce* the records, they had not technically been "spoliated" since the government – according to Dr. Chelton, at least  – actually *retained* the records.  *Ruiz* Court Reporter's Record, Vol. 3 pp 176-77, 183-86; 189 (Reporter's Record excerpts attached as Exhibit 10).   The district court agreed and removed the spoliation instruction.  The jury rejected the government's affirmative defense anyway, and it settled the case on appeal. That was in 2009, the same year the case at bar was filed.

As Judge Wilson heard during the telephonic hearing on the government's motion to stay discovery, Mr. McDonald now seeks supplementation of those fitness reviews and supporting documentation that are described above.  The government has failed to produce the FOH records of CSOs deemed fit for duty, although those records are highly probative on the business necessity defense.  At least two courts have already ordered such records to be produced, and they should be.  These documents show that the government, which professes to be acting in a manner that enhances the security of the American public and the judiciary, has instead compromised it by qualifying CSOs who have uncorrected severe hearing loss,  morbid obesity, congestive heart failure, severe coronary artery disease, blindness in one eye and the inability to pursue suspects, while terminating such officers as Mr. McDonald, who is extremely fit and able to perform all facets of the job, and

did so for seven years.  Clearly, a standard that compromises safety instead of promoting it is not a business necessity.

For the Court's benefit, Exhibit 11 contains excerpts from the records the government produced in *Gunnels*.  Many of these were exhibits that were admitted into evidence without objection.  The jury relied on these documents because they disprove any business necessity.  The records show that the standards are compromising safety, not enhancing it.

The government argues that it only need produce its records about Mr. McDonald, which is the same argument it made in *Ruiz*.  Yet the government has chosen to assert two affirmative defenses, those of business necessity and direct threat.  In order to prove business necessity and excuse otherwise unlawful qualification standards that screen out those with disabilities, the government must prove all the elements of the defense.  The very first element is that the standard must be "uniformly applied."  *See* 29 CFR 1630.15c and Pattern Jury Instructions Civil, Fifth Circuit (West 2009) 11.7.4.   Logically, it cannot be a "standard" at all unless it is followed uniformly.  Otherwise, it is individualized assessment, and the government must prevail on its direct threat defense in that case.

In order to assess whether the government does uniformly apply its qualification standards, which is its burden, the plaintiff must have access to how the government applies its standards to CSOs in the real world.  Here is the paradox.  Twice, courts have ordered these records produced.  When the bankers' boxes of records revealed a dysfunctional ad hoc system of clearing and rejecting CSOs, these documents became the foundation of the jury's "no" answer to the business necessity question.   These records demonstrated that morbidly obese individuals were cleared, those with congestive heart failure were cleared, those with severe and profound hearing loss were cleared and

15

those blind in one eye were cleared.  Worse yet, the government cleared numerous individuals who had actually *failed* the hearing tests.

Even if the government had not asserted affirmative defenses, the records of those CSOs the government declared "fit" is directly relevant to the question of whether Mr. McDonald was "qualified" for the job.  These records show that many CSOs were determined "qualified" despite much worse impairments than Mr. McDonald.  In fact, these records show that the government has cleared people with severe hearing loss who worked without the advanced bicross hearing aid that actually allows him to have very good binaural hearing.   Given that other CSOs have much worse hearing than he does, which the government's own records prove, this is strong evidence that he is indeed "qualified" as that term is defined by the Americans With Disabilities Act and the Rehabilitation Act.

Now we turn to the *manner* in which the government now claims that it retains these fitness reviews and supporting documentation.  As the Court can see from the government's answers to Interrogatory Nos. 13-16, it has gone back and forth on what *paper* records it retains and what records it does not.  In *Gunnels*, the records were logically produced in alphabetical order (with a HIPPA protective order in place) for each CSO in the country.  The confidentiality of all CSOs was thus protected. The information in the boxes was unredacted, so the undersigned to correlate the fitness memoranda with the medical chart that was appended to it.

They were organized as follows.  The fitness determination memorandum (either fit or unfit) was followed by the physicians' notes about the CSOs medical conditions (hereinafter "chart") compiled by the government's occupational medicine physicians who decide who is to be declared fit and who is declared unfit.  What these records showed were dozens of CSOs who actually failed the tests or failed to complete the tests were nonetheless cleared for duty by the government, when

people who actually passed the tests (like Mr. McDonald and Mr. Ruiz) were rejected.  They also show that CSOs with asymmetrical hearing loss (which Mr. McDonald has) were cleared for duty.

Yet the government, afer being ordered by Judge Wilson to answer interrogatories about this, explains that after these documents were produced in *Gunnels*,  it decided to change the way it retains this information.  It explains that it uses the MERITS system to retain its records.  That is nothing new, since it is the exact same system it used when it produced the three bankers's boxes of fitness review documents in the *Gunnels* case.  In any event, the government explained in the case at bar, that after the *Ruiz* case, it stopped destroying *paper* records in 2008.  In 2009, however, the government says that it shipped off the paper records to Akal, its  co defendant in this case. Yet it appears to claim that it still has the electronic records.

In any event, all this maneuvering appears of no importance, because the government admits that it does retain, in electronic form, all of the type of information that it produced in *Gunnels* and was ordered to produce in *Ruiz*.  For example, in its answer to Interrogatory No. 13, the government concedes that "there have been no significant substantive changes from 2002 to date in the medical information retained in the MERITS database."  However, the government now explains that the documentation in what we have called the "chart" is no longer on the *printed* page as it was before, and is now stored in the government's (Federal Occupational Health) "*computer* database."  It can therefore be retrieved using the MERITS program or by "capturing" what the government calls "screen shots" of the medical chart compiled by the government physicians.  See Answer to Int. No. 13.

Regardless of *how* the government supplements the information it has previously furnished in connection with its affirmative defenses, it must supplement that information.  There are a number

of ways it can do this, but up to now, it simply has refused to comply, attempting to conceal from Mr. McDonald the medical charts for CSOs who were cleared for duty.

The government can produce the MERITS database, protected by protective order insuring privacy of the records, so that Mr. McDonald can access the charts and fitness reviews for CSOs cleared for duty.  Or it can supply the printed information as it did before in *Gunnels* after being ordered to do so.   In other words, whether it is electronic or paper, the records must be supplemented.

Finally, although the government spends most of its arguments on the issue of patient confidentiality, this is a red herring, since in each of the previous cases, the parties entered into a protective order preserving private data, and at trial, the parties redacted all such information. Moreover, this argument was made and rejected in the Order granting the motion to compel, attached hereto as Exhibit 9.   The Court pointed out that the privacy interest of third parties were protected by a protective order.  That order has protected the privacy of these third parties for six years, so it is curious that only now is the government refusing to give up the records at all.

In any event, in order to obtain experts' reports, Mr. McDonald needs the discovery to which he is entitled, and he needs this information promptly.  Just because the government managed to run out the clock in the *Ruiz* case is no justification for concealing it now, at the outset of discovery, in this case.

## IV.  The Third Deficiency: Government Failure to Comply with Rule 30(b)(6)

As outlined in the conferral letter, the government initially disregarded the Rule's directive and failed to designate any witnesses at all for the topics listed in the notice.  However, during the conferral process, the government named witnesses for most of the topics, and then confirmed its good faith in actually supplying those witnesses on the topics, and it likewise signified that it would

18

prepare the witnesses in accordance with Rule 30(b)(6).  However, there are seven topics which the government resists designating witnesses.  Further, the government has interposed numerous improper and obstructive objections that should be overruled.

Rule 37(a)(3)(B)(ii) provides that the Court should "compel" a discovery response if a party "fails to make a designation under Rule 30(b)(6)."   Because of the government's failure to make proper designations with respect to seven topics, the Court should order the government to comply with the Rule and the Notice of Deposition.

We begin with the Topics which the government has refused to properly designate witnesses, and we finish with the dozens of inappropriate objections that the government has interposed.

1. **Failure to Designate Witness on Topic 16.**  There is one topic for which the government simply stonewalls the plaintiff, and that is Topic 16, which reads as follows: "Any facts supporting the various affirmative defenses stated in Affirmative Defense 11."   That paragraph of the government's original answer asserts the following affirmative defenses: sovereign immunity, limitations, laches, equitable estoppel, contributory negligence, the statute of frauds, assumption of the risk, fraud, accord and satisfaction and waiver.  Some appear to be ludicrous on their face in a disability discrimination case, including "contributory negligence" and "assumption of the risk."

The plaintiff respectfully believes that these affirmative defenses violate Rule 11, which requires that "the claims, defenses or other legal contentions" must have a good faith basis for them. Claims and defenses have the same standard.  Neither a claim nor an affirmative defense should be asserted unless there is a good faith argument for making it.  The plaintiff has not asserted boilerplate claims because the only good faith cause of action he chooses to assert is disability discrimination.

However, taking the government at its word, and assuming all these affirmative defenses are pled with some sort of evidentiary support, the plaintiff directed it to produce a Rule 30(b)(6) witness to testify about the "facts" that support those affirmative defenses.  Instead, the government simply refuses, claiming the Topic is too vague.  This objection should be overruled and the government required to comply with the Rule or abandon these affirmative defenses.

2.  **Failure to Produce Witnesses on Topics 5, 6, 17, 18, 19, and 21**.  On five other topics, the government did name witnesses, but the letter naming them specifically refuses to produce them to discuss the topics fully.  This applies to Topics 5, 6, 17, 18, 19 and 21.  Here are those topics:

Request 5.  The specific basis for each medical disqualification of a Court Security Officer from the year 2000 to the present.

Request 6.  Any work-related problems caused by medical conditions (such as diabetes, heart disease, hypertension) that have arisen in the course of performing the essential job functions of Court Security Officers from 2000 to the present.

Request 17.  The issue of how the government records the information collected and opinions stated during the medical fitness reviews of applicants for employment as Court Security Officers or incumbent CSOs and whether that process has changed since the government produced records in *Gunnels v. Ashcroft*, No. V02-132, examples of which are attached as Exhibit A (these are examples), which the government identified as recording the information collected and opinions stated during medical fitness reviews of applicants and/or incumbents for employment as Court Security Officers.

Request 18.  If there has been any change in the manner in which you document the medical fitness reviews of CSOs and/or applicants since the documents attached as Exhibit A were produced, the issue of how the information has been documented since that time, who made the decision(s) to change the documentation process, who participated in such decision(s), when the decision(s) was made, and the reasoning behind such decisions.

Request 19.  The issue of whether the government advised former CSO incumbents or applicants with pending cases challenging their termination at the time of any changes stated in response to Topic 17 that you were changing the process for documenting medical fitness reviews, and if not, the issue of why they were not so informed, and who made such decision, and when.

Request 21.  The issue of whether you advised former CSO incumbents or applicants with pending cases challenging their termination at the time of any document destruction revealed in response to Topic 20 that you were destroying documents, and if not, why they were not so informed, and who made that decision, and when.

These topics deal with the issue of the government's fitness for duty documents for CSOs other than

Mr. McDonald.  This is addressed above, in connection with the requests for production.  The

disposition of the government's objections to those requests will dictate the resolution of the Rule

30(b)(6) Notice.

3.  **Improper Objections**.  We turn now to the objections.  The objections to Topic 3, for

example, are wholly inappropriate.  The topic is quite simple: "The reasons the USMS believes that

hearing aids may not be utilized to pass the hearing tests for work as a Court Security Officer."

The topic is why the government banned the use of hearing aids to comply with the hearing testing

for CSOs.  Yet the government "objects" by simply arguing its side of the case, and by claiming that

the topic requires it to produce documents it does not have.  This pattern continues in the responses

to Topics 5, 6, 7, 8, 10, 11, 12, 13, 14, 16, 17, 18, 19, 20 and 21.  Among these rather unseemly

objections are these:  It objects to Topic 10( "the actual work performance of the plaintiff in

connection with the essential hearing functions of the job.")  The government objects on the basis

that it did not fire him for misconduct or failure of performance.  However, one of the elements of

an ADA claim is proof that Mr. McDonald was "qualified" (i.e, able to perform the essential

functions of the job).  The government says he was not, and this topic goes to the heart of this issue

in that it deals with his "actual work performance."  This objection should be promptly overruled.

Likewise, the objections to Topics 11, 12, 13, 15, which all direct the government to supply

a witness to testify about the various other affirmative defenses, such as direct threat, business

necessity, undue hardship, and "bona fide occupational" standard, are off the mark.  The government

claims that the topics are "inappropriate" because they deal with legal conclusions.  The government

has filed a pleading asserting these affirmative defenses, and the objections should therefore be promptly overruled.

## Conclusion

Congress has defined unlawful disability discrimination the use of qualification standards that screen out those with disabilities. Employers can excuse otherwise unlawful discrimination by proving the affirmative defenses such as direct threat and business necessity. Yet what a party who utilizes a standard that tends to screen out those with disabilities *cannot do* is assert affirmative defenses and then resist discovery on them. This motion should be promptly addressed, and the government ordered to promptly comply with these requests which are now months old. Likewise, the myriad of boiler plate objections in the responses to the requests should promptly be overruled.

Respectfully submitted,

s/ John Griffin, Jr.
Texas Bar No. 08460300
203 North Liberty Street
Victoria, Texas  77901
(361) 573-5500 – Telephone
(361) 573-5040 – Telecopier

Katherine L. Butler
Texas Bar No. 03526300
1007 Heights Boulevard
Houston, Texas  77008
(713) 526-5677
Fax (713) 526-5691

Michael D. McGrew, OBA #13167
223 North 3rd Street, No. 206
Muskogee, Oklahoma 74401
(918) 684-4321
Fax (918) 684-4322

Counsel for the Plaintiff

**Certificate of Conference**

I contacted counsel for the government by letter dated June 10, 2010, and then spoke with them at length on June 17th to obtain their position on the issues contained in this motion to compel. Counsel have conferred in good faith and, after a sincere attempt to resolve our differences, have been unable to reach an accord.  Thus, based on our extensive consultations, I can state that the government is opposed to the granting of this motion.

/s/ John W. Griffin

**Certificate of Service**

I certify that a true and correct copy of this document has been served upon the defendants through the electronic filing system of the Northern District of Oklahoma on June 21, 2010.

/s/ John W. Griffin